## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | |
| **SPLIT VEIN COAL COMPANY, INC.,** | * | **CHAPTER 11** |
| Debtor | * | |
| | * | **CASE NO. 1:03-bk-02974MDF** |
| **SPLIT VEIN COAL COMPANY, INC.,** | * | |
| Plaintiff | * | |
| | * | |
| v. | * | **ADV. NO. 1:07-ap-00006** |
| | * | |
| **GILBERTON COAL COMPANY,** | * | |
| **SEEDCO NP, LLC** | * | |
| Defendants | * | |

## OPINION

In this adversary case, Split Vein Coal Company, Inc. ("Debtor") seeks an award of damages against Gilberton Coal Company ("Gilberton") for the appropriation and conversion of 507,116 tons of coal refuse left by Debtor on land it leased from Gilberton.[1]  Debtor also seeks damages for Gilberton's unauthorized ingress and egress over Debtor's property during the period Gilberton removed Debtor's coal refuse.  In its counterclaim, Gilberton requests damages for the costs it incurred in fighting a fire that originated in the coal refuse pile created by Debtor.[2]  This counterclaim was abandoned after trial because of inadequate proof of loss, but Gilberton maintains a claim for the value of coal refuse that Debtor's agent removed and sold.  For the reasons discussed below,  judgment will be entered in favor of Debtor on its complaint and against Gilberton on its counterclaim.

---

[1] I have jurisdiction to hear this matter pursuant to 28 U.S.C. §§157 and 1334.  This matter is core pursuant to 28 U.S.C. §157(b)(2)(A) and (O).  This Opinion constitutes the findings of fact and conclusions of law required to be made pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") 7052, which is made applicable to contested matters by FRBP 9014.

[2] The fire ignited in the coal refuse  post-petition and was still burning when Gilberton filed its counterclaim.

# I. Factual and Procedural History

## A. The Parties

Debtor is a Pennsylvania corporation with its principal place of business in Northumberland County, Pennsylvania. Debtor's sole shareholder and president is Elwood Swank ("Swank"). Debtor's business activities included the recovery, reprocessing and sale of coal refuse recovered from lands leased for this purpose. In order to process the coal refuse, Debtor operated two processing plants known as the Henry Clay and the Paxinos breakers.

Gilberton is a Pennsylvania corporation owned and operated by the family of John W. Rich ("John Rich").[3] Gilberton is primarily engaged in owning and leasing real property containing anthracite coal and/or coal refuse banks. Generally, it is Gilberton's business practice to enter into license agreements with parties for the removal of material for which the licensee pays Gilberton a royalty based upon the tonnage of material removed.

Originally a named defendant in this matter, Seedco, NP, LLC ("Seedco") was dismissed from the case on February 12, 2009.

## B. Processing of Coal Refuse

Coal refuse (also referred to in eastern Pennsylvania anthracite mining as "culm") is waste material from coal mining operations. Between the early 1800s and late 1970s, mining companies discarded coal refuse by dumping it on vacant land where it accumulated in large

---

[3]Other companies owned by the Rich family relevant to this case are Reading Anthracite Company ("Reading Anthracite"), Waste Management and Processors, Inc. ("WMPI"), Schuylkill Energy Resources ("SER"), Schuylkill Skyport, Inc. ("SSI") and Barakat Associates, Ltd. ("Barakat"). SSI owned the coal refuse that was on the land owned by Gilberton and that was the subject of the mining agreement between Gilberton and Debtor. SER owns and operates a cogeneration plant that burns anthracite coal and refuse material for the purpose of generating electricity sold to third parties. WMPI processes waste anthracite for Gilberton Power Company, another Rich entity which owns and operates a cogeneration plant. Barakat is a company that provides hauling services to other Gilberton affiliates. Barakat operates its own trucks and also engages independent truckers to haul materials.

2

piles or banks. Culm consists of coal, rock, shale and other non-combustible materials. *See* 52

P.S. § 30.53. It has a low BTU value, and until new technology was introduced in the 1980s,

culm had no commercial value. It is estimated that by the late 1970s, when laws were enacted

requiring the reclamation of mined sites, approximately 2.4 billion tons of culm had been

abandoned throughout Pennsylvania's coal region.[4]

Before culm can be burned effectively, it must be processed by running it through a

breaker. The resulting material is separated into different categories based upon the size of the

material.  The breaking process is not a precise one; coal often remains attached to or mixed with

non-combustible materials after the process is completed. Even after this processing, waste is

created, which is redeposited on the property's surface. All phases of coal refuse processing,

including the redepositing of culm, are subject to federal and state environmental statutes and

regulations.  In Pennsylvania, a business engaged in coal refuse recovery must obtain a surface

mining permit ("SMP") from the Pennsylvania Department of Environmental Protection

("DEP") prior to commencing surface operations.  Upon completion of its work on a culm bank,

a mining company is required by law to commence reclamation activities, including erosion

control and revegetation. *See* 28 Pa. Code § 88.1 et.seq. (2009).

### C.  The Parties' Agreement

On or about September 12, 1991, Gilberton and Debtor entered into an agreement (the

"Agreement") in which Gilberton granted to Debtor a license and easement to recover and

remove coal refuse located on the "Excelsior Bank"[5] ( "Excelsior" or "the Bank"). The

--------------------------------------------------

[4]Anthacite Region Independent Power Producers Association (ARIPPA), "Coal Refuse," fact
sheet, undated, accessed on December 6, 2009 at: http://www.arippa.org/coalrefuse.asp.

[5]So named because of its location near the village of Excelsior, Pennsylvania.

3

Agreement is also referred to in paragraph 22 as a "lease." (*See* Debtor Ex. 1. The initial term of the Agreement was one year and thereafter month to month. The Agreement granted Debtor the right to recover three inch and smaller sizes of "bank material," a term defined in Section 1 of the Agreement as "raw bank material, culm." In return, Debtor agreed to pay Gilberton a royalty of $3.50 per net ton of material recovered.[6] Debtor also agreed that it would pay Gilberton a minimum royalty of $1,000.00 per month beginning with the execution of the Agreement. (Debtor Ex. 1, p. 2-3). After Debtor began removing coal from the Excelsior Bank, the parties orally modified the Agreement, providing that Debtor would pay a royalty of $3.00 per ton for "fine" culm and $2.00 per ton for "coarse" culm. Debtor had entered into several agreements with Gilberton-related companies in the past, some of which were written agreements and some of which were informal oral agreements between Swank and John Rich.

The Agreement did not address the issue of whether Debtor was permitted to deposit and store coal refuse it had mined and processed at other sites on Gilberton's land.[7] Swank testified that Gilberton was aware Debtor was depositing foreign culm on the Excelsior Bank and never protested this practice. More specifically, Swank testified that when he informed John Rich that he intended to deposit culm from other sites on Excelsior, Rich did not object. John Rich was not called as a witness by either party.

One of the issues in dispute is the parties' relative rights to any culm remaining on the property upon Debtor's breach or the termination of the Agreement. Section 8 provides that:

_____

[6]As an additional royalty not based on the quantity of culm removed, the Agreement provided that Debtor was to pay real estate taxes on the premises. The record is unclear as to whether or not Debtor paid the real estate taxes provided for in the Agreement.

[7]For purposes of brevity and clarity in this Opinion, I will refer to culm deposited on Excelsior Bank that originated from other locations as "foreign" culm. I will refer to culm present on Excelsior Bank when the Agreement was executed and later redeposited onto the Bank after processing as "Excelsior culm."

4

>All Bank Material not removed and transported from the Premises at the expiration of this Agreement, or not removed at the time of any breach of this Agreement, shall be and remains the property of Gilberton. Split Vein's failure to commence removal of the bank material, or a suspension or stoppage of removal on the Premises for a continuous period of four (4) months, shall nullify this Agreement, and thereupon, at any time thereafter, *Gilberton may declare this Agreement terminated and void*, and without legal procedure, Gilberton shall retake possession of the Premises together with all improvements thereon.

(Debtor Ex. 1, p. 6) (emphasis added). Gilberton asserts that Debtor breached the Agreement in several respects. For example, it is uncontroverted that Debtor stopped removing bank material for a continuous period of more than four months. Therefore, Gilberton argues, regardless of the source of the coal refuse, any culm left on Excelsior when the Agreement was breached became Gilberton's property. Debtor counters that because it paid a royalty on the culm removed from the bank, it acquired title that it did not forfeit. Debtor cites to Section 14 of the Agreement, which provides that title to the culm removed from Excelsior does not pass to Debtor until the appropriate royalty is paid to Gilberton. (Debtor Ex. 1, p. 11). By implication, Debtor argues, title to the culm mined from the Excelsior Bank and for which a royalty had been paid did pass to Debtor.

Section 19 of the Agreement provided that upon Debtor's breach or failure to perform, the Agreement "shall be subject to cancellation at the option of Gilberton and then become absolutely void, and of no effect, and after ten (10) days written notice by Gilberton to [Debtor], it shall and may be lawful for Gilberton to re-enter and take possession of the Premises . . . . (Debtor Ex. 1, p. 15). Further, if the required royalties were not paid, after ten days notice of default the Agreement was subject to cancellation by Gilberton. (Debtor Ex. 1, p.16). Debtor argues that because Gilberton did not give notice of its intent to terminate the Agreement until after Debtor filed its petition, the Agreement did not automatically terminate or become void, as Gilberton has suggested.

5

One of Debtor's duties under the Agreement, which became particularly relevant during Debtor's operations at Excelsior, was its obligation to protect the premises against fire.  In the event of a fire, Debtor was required to carry out any measures recommended by Gilberton to extinguish the fire or to prevent its extension. If Debtor failed to prosecute effective measures, Gilberton had the right to assume responsibility for extinguishing the fire at Debtor's expense. (Debtor Ex. 1, pp. 6-7).

### D.  Debtor's Operations on the Excelsior Bank

In November 1990 and May 1991, Debtor purchased two tracts of land[8] adjoining the Excelsior tract for the specific purpose of obtaining overland access to the culm on Gilberton's land.[9] (Debtor Ex. 3)  On or about October 22, 1991, DEP issued an SMP authorizing Debtor to remove coal refuse from Excelsior. (Debtor Ex. 4)  The permit allowed Debtor to redeposit culm removed from Gilberton's land that had been processed at Debtor's breaker, but did not specifically  authorize the deposit of foreign culm.

Debtor set up a screening plant on the Gilberton property to process coal refuse on site. Bank material less than 3/8 inch was sold to Gilberton-related companies. Culm between 3/8 inch and 3 inches was trucked to Debtor's Paxinos breaker for processing after which the waste material was redeposited on Excelsior.  Swank testified that as many as fifty (50) loads were deposited in a single day, but no records were maintained of the tonnage of culm redeposited

---

[8] Prior to 1991, Excelsior Bank was surrounded by three separate parcels of real estate: a 22.5 acre tract owned by Northumberland County (owned by Seedco at the time of trial) and two tracts previously owned by Penn Central Properties, Inc. and Ermin Coal Co., Inc., respectively.  ( Debtor Ex. 2; 2/11 N.T. 11).  The latter two tracts were acquired by Debtor to access the Excelsior Bank.

[9] The Excelsior tract contained a second culm bank that was not subject to the license granted to Debtor by the Agreement.  This bank was not affected by the fire and the culm that comprised it still existed on the site at the time of the hearing.

6

after processing. Between July 1991 and July 1998, Debtor removed culm from the Excelsior Bank and paid royalties to Gilberton totaling $1,299,839.99. (Gilberton Ex. 5; 2/11 N.T. 64) As of the date of its bankruptcy petition, Debtor had paid all royalties owed for removing bank material and strippings, but no additional royalties were paid, including minimum royalties as specified in the Agreement. (Gilberton Ex. 5) Debtor ceased operations on Excelsior in 1998 because the site was depleted and removed its equipment. When Debtor completed its operations on Excelsior, it left both Excelsior culm and foreign culm on the site. The coal refuse was not sold immediately after processing because the quality of the material would not have brought a price in excess of the hauling expenses. On or about August 12, 2000, Swank informed an inspector for DEP that the remaining culm would be removed when market conditions improved. (Debtor Ex. 18; 2/12 N.T. 26 - 27).

Under the Agreement, Debtor was required to comply with DEP regulations, which mandated reclamation of the land by the permittee. Reclamation generally involves the leveling of the mined surface and the distribution of organic materials such as topsoil or leaf compost so that it will support new vegetation. Debtor's mining activities ceased in July 1998, but reclamation was not commenced until 2000.[10] Debtor engaged a contractor, Ed Linkus ("Linkus"), to provide leaf compost, which he spread over the culm that had been deposited on the site. When fire later flared up on the culm pile covered with leaf compost, the depth of the compost was suspected as a factor in the difficulty the parties encountered in fighting the fire.

_____

[10]DEP regulations at the time did not require Debtor to commence reclamation within any specific period after cessation of coal waste removal. DEP regulations permitted Debtor's bond to remain in place pending reclamation, and its surface mining permit to be renewed when it commenced reclamation.

7

*E.  Debtor's Bankruptcy Petition*

On May 19, 2003, Debtor commenced the instant Chapter 11 bankruptcy case.  When the petition was filed Debtor did not include the coal refuse on the Excelsior site as an asset, nor did it schedule the Agreement with Gilberton as a executory contract or lease. On January 11, 2007, after the within complaint was filed, Debtor amended its schedules to include the culm and the Agreement as assets of the estate.

On September 19, 2006, Debtor received a letter from Gilberton's counsel purporting to provide formal notification  of termination of the Agreement. Although Gilberton  had been provided with notice of  Debtor's bankruptcy filing and was aware the case was pending, it did not seek relief from the stay prior to posting this letter.

*F.  The Fire on Excelsior Bank*

On or about July 11, 2005, a fire was discovered on the Excelsior Bank.  According to a July 14, 2005 DEP Inspection Report, the fire was extinguished by the compost contractor.  Swank testified that he was unaware of the fire at the time of its occurrence.

Fire was again discovered on the bank in early December 2005 and Swank was notified.[11] He immediately drove to the site to survey the damage and concluded that Debtor's culm was being consumed. Debtor, Vince Guarna (who later contracted with Gilberton to fight the fire), Linkus, and numerous local fire departments fought the fire in its initial stages, but their efforts were unsuccessful.  DEP notified Reading Anthracite about the occurrence of the fire, but no action was taken by any of the Gilberton-related companies.  (Debtor Ex. 20)

---

[11]Swank could recall neither the identity of the person who informed him of the fire nor the exact date on which he was informed.  The cause of the fire was never conclusively determined.

8

The fire spawned numerous complaints from local residents regarding smoke and odors, and DEP monitored the progress of the fire to address their concerns. On December 23, 2005, DEP issued a Compliance Order citing Debtor for allowing the fire to ignite and for having failed to contain it. Several DEP inspectors and their supervisors visited the site frequently in the ensuing weeks and months to ensure that sufficient efforts were being made to combat the fire.[12] (Debtor Ex. 20 - 23) On several occasions the fire appeared to have been extinguished, but then days or weeks later would reappear within the bank. A June 13, 2006 DEP report stated that "the leaf compost/refuse pile fire appears to [be] out. The pump, water cannon, dozer and fuel truck remain on site. Approx. 10 acres has (sic) been affected by the fire. When it is certain the fire is extinguished[,] reclamation needs to begin." (Debtor Ex. 26).

In July 2006, the fire again reignited. Swank, weary of battling the persistent blaze, sought assistance from Victor Kocur ("Kocur"), his stepson. Kocur, a heavy equipment operator, requested Swank's permission to remove and sell culm from the Excelsior site to recover the cost of fighting the fire. On July 3, 2006, Swank and Kocur signed a bill of sale in which Swank purported to sell to Kocur the "refuse material from [Debtor's] breaker dumped at the Excelsior job" for a price of 25 cents a ton to be paid on a removal basis. (Debtor Ex. 65). Swank and Kocur rescinded the agreement on July 30, 2006. (Debtor Ex. 66).

Before he began to fight the fire, Kocur met with representatives of both DEP and Gilberton. A DEP Inspection Report dated July 27, 2006 describes a discussion between Kocur and a DEP Inspector regarding Kocur's intent to "reprocess the refuse material" as part of his

---

[12]At least nineteen (19) Inspection Reports were filed by various DEP officials between December 8, 2005 and December 26, 2006. An April 2006 report indicated that the fire was successfully extinguished, and that the December 23, 2005 Compliance Order "is therefore lifted." (Debtor Ex. 24). In fact, the fire had not been extinguished, and DEP inspectors remained closely involved in the fire fighting effort, filing numerous additional reports in the ensuing years.

9

fire fighting plan. (Debtor Ex. 28). A DEP report dated August 16, 2006 further indicates that "there may be a market for the material and the whole bank may be removed, eliminating any fuel for future [fires]." (Debtor Ex. 30). In August 2006, Kocur met with Michael Rich in an effort to obtain Gilberton's assistance in fighting the fire. Kocur wanted to remove the burning culm to fight the fire and also sought a license to remove and sell the culm that Gilberton had stockpiled on and around the Excelsior site. No agreement was reached between the parties.

By letter dated July 13, 2006, Gilberton granted Guarna and Fox Coal Company ("Fox Coal") permission "to excavate, remove and prepare breaker refuse material from the Excelsior Refuse Bank." (Debtor Ex. 54). By letter of even date, Guarna requested permission from DEP to "take over" Debtor's SMP for the Excelsior Bank and to receive "all bonds associated with this project . . . at their cash value." (Debtor Ex. 55). Although Fox Coal and Guarna ultimately proceeded with excavation and removal of culm from Excelsior, DEP did not approve the transfer of Debtor's permit nor did it transfer to Fox Coal the reclamation bonds that Debtor had posted for the site.

On November 22, 2006, Swank sent a letter to DEP asserting Debtor's claim of legal title to the culm that it had placed on Excelsior. (Debtor Ex. 60). In response to Swank's letter, DEP required Gilberton to keep an accounting of all tonnage of culm it removed from the site. Gilberton was instructed to remove only the amount of culm necessary to fight the fire.

### G. Gilberton's Removal of Culm from Excelsior Bank to Fight the Fire

In July 2006, while Debtor was still responsible for fighting the fire on Excelsior, Gilberton employed Fox Coal to fight the fire by removing the burning culm. Gilberton agreed

Case 1:07-ap-00006-MDF   Doc 120   Filed 12/11/09   Entered 12/14/09 15:54:44   Desc
Main Document      Page 10 of 29

to pay Fox Coal a loading fee of one dollar per ton for hauling the material from the site.[13]   On December 7, 2006, DEP entered an Administrative Order requiring Gilberton to extinguish the fire.  (Gilberton Ex. 7) The order also released Debtor from any contractual fire-fighting obligations. (Gilberton Ex. 7; 2/12 N.T. 252). Under the Administrative Order, Gilberton was given 120 days to either "completely extinguish all fires on the Site or submit a progress reoprt to [DEP]." (Gilberton Ex. 7).  Gilberton was not successful in extinguishing the fire within the allotted period and ultimately requested several extensions of the deadline.  The fire was not completely extinguished until September 2008.

During the time that it burned, the fire spread beyond Gilberton's property lines to culm banks on adjacent property owned by Seedco.  With Seedco's permission, Fox Coal removed a significant quantity of culm from its property.[14]   In total, Fox Coal removed over 507,116 tons of culm from Gilberton and Seedco properties.[15]  This culm was sold to three cogeneration plants, Mount Carmel Cogen, SER and WMPI, resulting in gross revenues for Gilberton in the amount of $3,241,840.23. The following chart shows the tonnage sold and the price per ton obtained by Gilberton from each purchaser.

---

[13] This fee later was reduced unilaterally by Gilberton.

[14] Asked to provide an estimate of the quantity of culm removed from Seedco's property, Guarna gave a "rough guess" of "at least 100,000 tons." (2/12 N.T. 122).

[15] The parties are in dispute regarding the issue of whether or not certain coal silt removed by Fox Coal was "virgin" material (i.e. not reprocessed culm).  No testimony was provided by either side regarding the total amount of the silt removed, but the general tenor of the testimony indicated that it was relatively *de minimis*.

11

| Purchaser | Tonnage sold | Price per ton | Total revenue |
|---|---|---|---|
| Mount Carmel Cogen | 158,529.45 | $5.10 | $   808,500.16 |
| SER | 325,234.30 | $7.00 | $2,276,640.10 |
| WMPI | 22,385.71 | $7.00 | $   156,699.97 |
| **TOTAL** | **507,116.46** | | **$3,241,840.23** |

In addition to Fox Coal, Gilberton employed several entities to truck the culm from the site. The activities of independent truckers were coordinated by Barakat, a Gilberton affiliate, which received a fee for its services. WMPI  provided labor and equipment for the project, Jack Rich, Inc. supplied fuel, and SSI, the purported title holder of the culm located on Gilberton land, was paid a royalty. All three entities are related to Gilberton. The costs incurred by Gilberton to extinguish the fire are set forth below.

| Payee | Service | Amount |
|---|---|---|
| Barakat | hauling | $1,815,506.27 |
| Fox | loading | $   477,081.86 |
| Fox | equipment rental | $     15,975.00 |
| WMPI | equipment rental | $   133,520.00 |
| WMPI | equipment repair | $     27,253.81 |
| WMPI | labor | $     86,464.00 |
| Jack Rich, Inc. | fuel | $     46,354.29 |
| SSI | royalty | $     28,647.37 |
| **TOTAL** | | **$2,630,802.60** |

12

## II. Discussion

The dispute in this case centers on the Agreement that was executed between the parties approximately twelve years before Debtor filed the instant petition and eighteen years before the trial of this adversary matter. The parties agree that the Agreement was orally modified in certain respects during the period in which the Debtor worked the Excelsior Bank, but they disagree about which provisions were modified. They also disagree on whether the Agreement became void once Debtor was in breach of its provisions. Gilberton also argues that Debtor cannot establish title to coal refuse deposited on Excelsior that was transported from other mining sites because the SMP did not authorize Debtor to deposit foreign culm on Gilberton's land.

### *A. The Surface Mining Permit*

Debtor admitted into evidence its application for the SMP, the permit itself and various modifications or "corrections" to the permit issued since the original was granted. (Debtor Ex. 4). In the format offered into evidence – an amalgam of separate documents totaling seventy-three pages – the licensing documents were somewhat difficult to construe as a unified whole. The documents included a letter from a DEP District Manager dated October 22, 1991, a "Surface Mining Permit No. 49910202," a "Part A" (pertaining to water quality issues at the site), and a "Part B" (setting forth certain "Special Conditions or Requirements" regarding the site). Part B, in turn, contained at least one reference to the Permit Application that Debtor had submitted. The Permit Application contained numerous maps and questionnaires, as well as contracts between Debtor and third parties.

The Court has closely examined Surface Mining Permit No. 49910202, Part A, Part B, and Debtor's Application for the Permit. The Application form signed by Swank on Debtor's

13

behalf on February 6, 1991 contains an explicit reference to the disposal of coal refuse. The left hand column on the first page states "This Application is for the following Type of Surface Mining Activities," and Debtor placed an "x" next to a line immediately below for "Refuse Disposal." The Application form does not contain an express distinction between Excelsior and foreign culm. In the record before me, none of the licensure documents issued by DEP in response to Debtor's Application contain express terms prohibiting or purporting to prohibit the depositing of foreign culm on the permit site. Notwithstanding the language of the SMP, Thomas Flannery, a surface mine conservation inspector supervisor for DEP, testified that the SMP did not authorize Debtor to deposit foreign culm on the site. He stated that if he had been aware that foreign culm was being dumped on the Excelsior Bank he "would have stopped it and had the material either removed, or had the permit corrected to accept that particular material." ( 2/11 N.T. 72). While Debtor would have been subject to administrative sanctions from DEP for violating the terms of the SMP, I am not persuaded that Debtor was acting in intentional disregard of DEP rules.[16] As discussed above, the Application that Debtor filed with DEP to obtain the SMP explicitly stated that Debtor intended to dispose of refuse on the site. (Debtor Ex. 4). The Permit itself contained no explicit language distinguishing foreign culm from Excelsior culm. The forms used by DEP for its inspection reports in this case contained a box which was to be marked with a "yes" or "no" by the inspector if refuse was being deposited at the site during the course of the inspection visit, but it also did not expressly distinguish between

---

[16]The Agreement provided in Section 8 that "Split Vein covenants and agrees to conduct all operations in a skillful and workmanlike manner and to remove the Bank Material and process the same in accordance with generally accepted and sound mining practices and in accordance with all laws, rules, regulations, [and] directives issued by the United States of America, the Commonwealth of Pennsylvania or any political subdivision, board, authority, office or department of any governmental entity." (Debtor Ex. 1).

14

foreign and Excelsior culm. Of the forty-four (44) Inspection Reports, twenty (20) were marked "yes" for refuse disposal. (Debtor Exs. 15, 19, 20, 22 - 35, 37, 38 and 47). Some of these affirmative answers were modified by phrases like "only as defined in permit conditions," presumably a reference to Part "B" of the Permit, labeled "Special Conditions or Requirements." However, Part B was similarly silent on the issue of depositing foreign culm. Under those circumstances, it appears that Swank could have reasonably deduced that he was in fact permitted to make the deposits. DEP's own inspector, Snyder, recorded his observations of Debtor's trucks depositing culm on several occasions, but apparently did not attempt to ascertain the origin of the culm. These actions suggest a relative lack of concern by DEP about the material's origin. For these reasons, I am not persuaded by Gilberton's argument that Debtor forfeited its interest in the culm by depositing it on Excelsior in contravention of the SMP.

### B. The Agreement

The Agreement grants Debtor an easement to traverse Excelsior Bank and a license to remove culm from the site. There are no disputes involving the easement or whether Debtor paid the required royalty when the coal refuse was removed from the site and processed. The primary issue regarding the enforcement of the Agreement is who owned the culm remaining on Excelsior Bank when Debtor's mining activities ceased and its reclamation activities began. Gilberton has asserted that because the Agreement and the SMP did not authorize Debtor to deposit foreign culm on its land, Gilberton cannot be held liable for conversion of material deposited in breach of the Agreement. Gilberton also alleges that any culm deposited on Excelsior became its property under Section 8 of the Agreement. Because it is undisputed that Debtor stopped removing bank material for a period in excess of four months, Gilberton argues

15

that under Section 8 the Agreement was nullified, and any material remaining on the site became Gilberton's property.

Gilberton's argument is flawed for several reasons. The silence of the Agreement on the deposit of foreign culm does not require me to conclude that Debtor's activities violated the Agreement. The parties regularly disregarded or modified its terms. For example, the Agreement required Debtor to pay royalties of $3.50 per ton for Excelsior culm, but Swank testified and Gilberton's records confirm that Debtor paid only $3.00 per ton for "fine" culm and $2.00 per ton for "coarse" culm. (Gilberton Ex. 5; 2/11 N.T. 188). The Agreement also required Debtor to pay real estate taxes on the Premises, but no evidence was provided that Debtor paid them after 1998, that Gilberton ever demanded payment or that it declared an immediate default based on the breach. Similarly, after Debtor ceased processing culm in July 1998 and removed its equipment, Gilberton did not demand the minimum monthly royalty payments required by the Agreement, and it did not declare a default until September 19, 2006. Thus, it seems perfectly in keeping with the parties' course of conduct and history of informal dealings for Debtor to deposit thousands of truckloads of foreign culm on Excelsior and believe that Gilberton's failure to object constituted consent to the practice. Swank testified convincingly that John Rich was aware that foreign culm was being deposited on Gilberton land and did not object. Therefore, I conclude that Gilberton acquiesced in Debtor's practices and, therefore, Debtor did not forfeit its interest in the refuse it deposited on the Excelsior Bank.

Gilberton's argument that the culm reverted back to Gilberton when Debtor ceased operations on Excelsior in 1998 also is not persuasive. Although Section 19 of the Agreement states that "all Bank Material not removed and transported from the Premises at the expiration of this Agreement, or not removed at the time of any breach of this Agreement, shall be and

16

remains the property of Gilberton," the Agreement also provides in Section 14, by implication, that title to the Excelsior culm passed to Debtor once the royalty was paid. When these two sections are read together, the meaning is plain. "Bank material not removed and transported" refers to culm that had not been mined and for which a royalty had not been paid. Had Debtor abandoned operations on the Excelsior Bank and the Agreement been terminated by Gilberton before Debtor completed its mining operations, unmined culm would have reverted to Gilberton. In the instant case, all of the coal refuse remaining at the site either was not "Bank Material," because it had been brought in from other locations, or it was culm for which Debtor had paid a royalty. Redepositing the culm on Excelsior did not return ownership of the culm to Gilberton.[17]

Section 19 of the Agreement provides that in the event of a breach, Gilberton has the *option* to cancel the Agreement after ten days written notice to Debtor. Further, Section 8 provides that if Gilberton determined that Debtor was in breach, the Agreement did not terminate automatically, but Gilberton was required to declare the Agreement terminated and void. This Gilberton did not do until September 2006, more than three years after Debtor's bankruptcy case had been filed and only after Gilberton was made aware that Debtor was asserting its ownership of the culm being removed to fight the fire. While Gilberton did not violate the automatic stay simply by declaring the default, it was barred from terminating the lease. *Am-Haul Carting, Inc. v. Contractors Cas. and Sur. Co.* 33 F.Supp.2d 235, 242 (S.D. N.Y. 1998) (holding declaration of default in and of itself did not violate automatic stay); *In re Sixteen to One Mining*

---

[17]On December 7, 2007, on a motion for summary judgment in this case, I issued an Opinion containing *dicta* in which I observed that culm originating from the Excelsior Bank would have become Gilberton's property upon a breach of the Agreement by Debtor. This *dicta* was based on an erroneous reading of the Agreement and a failure to consider the passage of title by the payment of royalties on removed culm.

17

*Corporation*, 9 B.R. 636 (Bankr. D. Nevada 1981) (finding notice of default valid as notice but nullifying the complaining party's attempt to terminate lease and obtain possession of property).

### *C. Conversion of Debtor's Culm*

As indicated in the Factual Findings, Debtor deposited culm onto Excelsior from two general sources – the Excelsior Bank itself and Debtor's other mining operations. Debtor seeks damages for the value of all the culm removed by Gilberton, including both the culm originating from Excelsior as well as the foreign culm.

"Conversion at common law is a tort by which the defendant deprives the plaintiff of his or her right to a chattel or interferes with the plaintiff's use or possession of a chattel without the plaintiff's consent and without lawful justification." *Chrysler Credit Corporation v. Smith*, 434 Pa. Super. Ct. 429, 434, 643 A.2d 1098, 1100 (citing *Stevenson v. Economy Bank of Ambridge*, 413 Pa. 442, 451, 197 A.2d 721, 726 (1964); *Bank of Landisburg v. Burruss*, 362 Pa. Super. Ct. 317, 320 n.1, 524 A.2d 896, 898 n. 1 (1987), *allocatur denied*, 516 Pa. 625, 532 A.2d 436 (1987)). A cause of action for conversion will lie if the plaintiff had actual or constructive possession of a chattel or an immediate right to possession of the chattel when the conversion occurred. *Eisenhauer v. Clock Towers Associates*, 399 Pa. Super. Ct. 238, 243, 582 A.2d 33, 36 (1990). A party may found liab1e for conversion by "[u]nreasonably withholding possession [of chattel] from one who has the right to it." *Martin v. National Surety Corporation*, 437 Pa. 159, 165, 262 A.2d 672, 675 (1970) (citing Prosser, *Torts* § 15 (2d ed. 1955)). Specific intent to harm is not required, only an intent to exercise control over the chattel that is inconsistent with the plaintiff's rights. *Shonberger v. Oswell*, 365 Pa. Super. Ct. 481, 485, 530 A.2d 112, 114 (1987).

In the Pennsylvania coal industry, the owner of the refuse remaining after the breaking process may lose his right to possession of the real estate on which the culm was deposited

without a concomitant loss of his right to possession of the culm itself. "The continuing right of the owner of a culm bank after his right of possession of the realty is terminated is well established." *Stair v. Com., for Use of Pennsylvania Game Commission*, 28 Pa. Commw. Ct. 457, 461, n. 5, 368 A.2d 1347, 1348, n. 5 (1977), *citing Sturdevant v. Thompson*, 280 Pa. 233, 124 A. 434 (1924). The *Stair* court further observed that when the amount of culm is of a great magnitude, "the right of entry takes on the character of an easement." *Id*.

The property at issue consists of the 507,116 tons of culm that Fox Coal removed from Excelsior to fight the fire. To prove its ownership interest in this culm, Debtor called five witnesses – Swank, John Swank, Kocur, Allen Rothermel, a former Split Vein employee, and Marvin Snyder, a former DEP inspector. John Swank testified that he hauled foreign culm and deposited it onto Excelsior on a daily basis between 2000 and 2003. Swank, Kocur, Rothermel and Snyder each testified to having personally observed numerous large-capacity dump trucks owned or leased by the Debtor depositing culm on Excelsior on an almost-daily basis between 1991 and 1998. As noted earlier, Swank testified that as many as fifty (50) truckloads were deposited in a single day. Snyder authenticated official reports that he created during his monthly inspections of Debtor's Excelsior operation, one of which stated that Debtor was depositing culm on the day of the inspection. (Debtor's Ex. 15; 2/11 N.T. 130). Nineteen additional DEP reports also show that Debtor was depositing culm at the time of the inspection. (Debtor Exs. 19, 20, 22 - 35, 37, 38, 47). These official DEP records, made contemporaneously with the individual inspector's observances, were unchallenged by Gilberton. Finally, one of Gilberton's own witnesses, Vincent Guarna, testified that he believed that Debtor had deposited foreign culm on the bank.

19

Gilberton attempted to rebut the statements of Debtor's witnesses by adducing testimony from Gabe Nassar ("Nassar"), Gilberton's site manager for Debtor's activities at Excelsior, Michael Rich, and Flannery that they were unaware that Debtor was depositing foreign culm on Gilberton's land. For its part, Debtor did not effectively impeach Nassar, Rich or Flannery on this point. However, the evidence from both parties regarding the hauling of culm from Excelsior for processing at the Paxinos breaker and then redepositing waste on the site demonstrated that Nassar, Rich or Flannery could have observed the deposit of culm without realizing the source of the material.

Moreover, the testimony indicated that the much of the culm that Debtor deposited on Excelsior was placed there between 1998 and 2003. Nassar was not on the site during that time, his duties there having ended when Debtor ceased culm removal in July 1998. Before 2006, Michael Rich only "occasionally" went to Excelsior and the Inspection Reports indicate that Flannery visited the site only twice between 1998 and 2003. (Debtor Exs. 17 and 18). Therefore, I conclude that the 507,116 tons of culm that Fox Coal removed to fight the fire was culm that Debtor had placed on the site and that it continued to own. Debtor's evidence was persuasive that it deposited an equivalent or greater amount of culm on the Excelsior site between 1991 and 2003. Specifically, the testimony of Debtor's principal and employees along with the testimony and contemporaneous official records of DEP Inspectors convince me that Debtor deposited hundreds of thousands of tons of its own culm onto Excelsior during the twelve-year period in which it conducted operations on the site. Debtor, however, no longer would hold title to the culm deposited on Excelsior if it had been abandoned before Debtor filed its petition.

## D. Abandonment

"Under Pennsylvania law, it is well-established that coal or coal by-products, when severed from the earth, become personal property which may be abandoned when left on the land of another with the intention of abandoning them." *In re G.M.P. Land Co.*, 33 B.R. 729, 731 (Bankr. E.D. Pa. 1983); *citing Llewellyn v. Philadelphia and Reading C. and I. Co., 308 Pa. 497, 162 A. 429 (1932); Fidelity-Philadelphia Trust Co. v. Lehigh Valley Coal Co., 294 Pa. 47, 143 A. 474 (1928).* "Abandonment includes both the intention and the external act by which the intention is carried into effect; intention may and indeed often must be inferred from acts." *Llewellyn,* 308 Pa. at 501-02, 162 A. at 430. "Furthermore, abandonment is to be determined from 'a consideration of the nature of the property and the conduct of the plaintiff in relation to it.'" *G.M.P.,* 33 B.R. at 731 (quoting *Russell v. Stratton*, 201 Pa. 277, 278, 50 A. 975 (1902)).

Under Pennsylvania law, there is a presumption against the abandonment of personal property. *Lehigh Valley Coal,* 294 Pa. at 480, 143 A. at 65. However, "if the thing claimed to be abandoned is considered valueless and a hindrance . . ." the presumption does not arise.[18] Swank testified that he attempted to market the culm prior to depositing it on Excelsior. A local company that operated a co-generation plant offered to purchase the culm, but the price was insufficient to offset the hauling costs. Gilberton argues that if the culm could not be sold at a profit, it had no commercial value and the burden shifted to Debtor to prove that it did not

---

[18]Gilberton cites *G.M.P. Land Co.*, 33 B.R. at 731 for the principle that the putative owner of property deposited on the land of another that is of no "commercial value" is not entitled to the presumption against abandonment. *G.M.P. Land Co.* cites *Lehigh Valley Coal* for this proposition. Although I agree with the bankruptcy court in *G.M.P. Land Co.* that the Pennsylvania Supreme Court determined that the presumption against abandonment could be lost based upon the nature of the property at issue, the Supreme Court did not use the term "commercial value" when referring to the value of the property. Rather, the Court stated that the presumption did not exist if the property was "valueless and a hindrance." I find this distinction in terminology to be significant.

abandon the culm it deposited on Excelsior. But Gilberton's statement of Pennsylvania law is inaccurate. The burden would have shifted to Debtor to prove that it did not abandon the culm only if the evidence supported a finding that the culm was "valueless" or a "hindrance" at the time it was deposited. Debtor was not required to show that the culm could be sold at a profit. Accordingly, because the culm did have value when it was deposited, Debtor is entitled to the presumption that it did not abandon the materials deposited on Excelsior.

"The intention to abandon must coalesce with external acts giving effect to such intention, which generally presents a question of fact for the factfinder." *Gilberton Contracting Company, Inc. v. Hook*, 255 F. Supp. 687, 693 (E.D. Pa. 1966) (citing *United National Gas Co. v. James Brothers*, 325 Pa. 469, 473, 191 A. 12 (1937)). Therefore, I must examine the evidence presented in this case to determine whether the facts presented support the conclusion that Debtor abandoned the culm.[19]

When Debtor filed its bankruptcy in 2003, it did not list the culm deposited on Excelsior in its schedules of assets. Neither did Debtor list the Agreement with Gilberton as an executory contract or lease. It was not until Debtor filed the within adversary complaint against Gilberton on January 11, 2007 that Debtor filed amendments to Schedule B to report approximately 600,000 tons of coal refuse deposited on lands owned by Gilberton and by Northumberland County. At the same time, Debtor amended Schedule D to report the Agreement, the lease with Northumberland County and another lease with Gilberton involving lands at Locust Gap.[20]

---

[19]I am mindful of the guidance provided by the Court of Appeals that "[a]bandonment is not a question of narrative or historical fact but an ultimate fact, a legal concept with a factual component." *Universal Minerals, Inc. v. C.A. Hughes & Company*, 669 F.2d 98, 103 (3d Cir. 1982).

[20]The lease with Gilberton for the Locust Gap location is not at issue in this adversary matter.

22

When questioned about why the Agreement and the culm were not reported on his schedules, Swank testified that he did not know. Debtor's failure to disclose what was later reported as an asset of significant value is evidence that Debtor had abandoned the culm as worthless waste. Even before the bankruptcy petition was filed Debtor took actions that suggested that it intended to abandon the materials deposited on the Excelsior Bank. If, as Debtor has alleged, the property in question had significant value when operations ceased in 1998, it would have been logical to maintain a record of the amount of culm deposited on land owned by another party. But no record was maintained of the coal refuse deposited on Gilberton's land. Swank testified that he did not intend to abandon the culm, but he also admitted that he used some of the coal refuse to fill in areas where he had removed strippings. When mining operations on Excelsior Bank were completed, Debtor began reclamation activities by layering the culm, covering it with mulch and seeding the area. These activities also suggest that Debtor was abandoning the material.

There are countervailing factors, however, that support Debtor's position that it did not abandon the culm. Most important is Debtor's continuing status as the lessee under the Agreement. Because the lease was not terminated before Debtor filed its petition, it maintained its rights of possession under the lease. Clearly, Debtor's failure to pay the minimum royalities and well as other breaches in the Agreement provided justification for Gilberton to terminate the lease years earlier, but it did not do so. At the time the petition was filed, Debtor was actively engaged in reclamation activities on the site. After the petition was filed, it repeatedly fought the fire that sparked in the mulch deposited as part of the reclamation activities. Debtor's reclamation bonds posted against the site were still in place at the time of the fire. Also, as the photographic evidence showed, Debtor's signage remained on the site as of the date of the trial in this matter. (Debtor Ex. 69(a)). Although it clearly was a violation of Swank's fiduciary

23

responsibilities as Debtor's principal to attempt to transfer Debtor's interest in the culm to his stepson, his action does support a finding that Swank thought the culm had value and did not intend to abandon it. Debtor's right to possession of the leasehold weighs heavily against a finding of abandonment. In *Llewellyn,* the Pennsylvania Supreme Court noted that the question of whether a lessee abandoned coal refuse deposited on another's land was at issue because the lease had expired, and the property had been surrendered without reserving a claim to the material left on the property. "There is no doubt but that [lessees] could have recovered the coal if they remained lessees of [lessor's] property." *Llewellyn*, 308 Pa. at 502, 162 A. at 430.[21] Thus, while Debtor's acts, particularly its failure to report the culm as an asset on its schedules, suggest that the material had been abandoned, other conduct in relation to the culm and the viability of the Agreement at the time Debtor filed its petition demonstrate that Debtor did not abandon the culm.[22]

### E. Gilberton's Claim of Privilege

Gilberton alleges that even if it did not own the culm, it was privileged to remove it and to cross Debtor's land to do so because this activity was undertaken to avoid "an imminent public disaster." Debtor and Gilberton both provided extensive testimony on Debtor's efforts and lack of success in permanently extinguishing the fire. The evidence demonstrates that Debtor

---

[21]In a letter to DEP dated November 22, 2006, Swank admits that he might have, in the future, abandoned the culm if the fire had not occurred, thus implying that he had not yet abandoned it. (Debtor Ex. 60). This letter is some evidence that Debtor had not abandoned the culm, but I give it little weight because it was written after the dispute had arisen over ownership of the culm.

[22] Debtor's actions in response to the fire support a finding that Debtor believed that it still had rights under the lease and an interest in the culm deposited on Gilberton's land. If Swank did not believe that the fire was consuming an asset that belonged to Debtor, then he would have had little incentive to fight it. Further, Gilberton took no action when the fire broke out to protect what it now claims is its asset.

24

fought the fire for eighteen months, but that it continued to flare up. After Debtor had been combatting the fire for a year, Gilberton began to show an interest in addressing the problem. The motivation for Gilberton's actions is unclear.

In December 2006, DEP issued the administrative order relieving Debtor from its responsibility for fighting the fire and substituting Gilberton as the responsible party. Gilberton proceeded to adopt the tactic advocated by Kocur – removal of the burning culm from the site. Whether DEP was justified in substituting Gilberton for Debtor as the party responsible for fighting the fire is not before the Court. Further, resolution of this case does not depend on whether Gilberton had opportunistic motives for fighting the fire or simply was attempting to comply with DEP's order. Even if I assume that Debtor's efforts were ineffective and that it was entirely appropriate for DEP to require Gilberton to commit its resources to extinguishing the fire, under the terms of the Agreement Gilberton was entitled to recover its costs, but it was not privileged to earn a profit by selling Debtor's property.

### G.  Damages Claimed by Debtor

#### (1) For Conversion of Debtor's Culm

Damages for conversion generally are measured by computing the market value at the time and place of conversion plus interest. *Universal Computer Systems, Inc. v. Allegheny Airlines, Inc.,* 479 F. Supp. 639, 645 - 46 (M.D. Pa. 1979), *citing Knuth v. Erie-Crawford Dairy Cooperative Association*, 463 F.2d 470 (3d Cir. 1972), *cert. denied*, 410 U.S. 913; *L.B. Foster Co. v. Charles Caracciolo Steel & Metal Yard, Inc.*, 777 A.2d 1090, 1096 (Pa. Super. 2001) (citations omitted).  A claim for conversion damages must have a reasonable basis for calculation and not be premised upon mere speculation. *Universal Computer*, 479 F.Supp. at 646, *citing Stevenson v. Economy Bank of Ambridge*, 413 Pa. 442, 197 A.2d 721 (1964).

25

Debtor asserts that its damages are the gross revenues Gilberton received for the culm it sold to fight the fire. Debtor's title to each ton of this culm was demonstrated by Swank's uncontroverted testimony that when Debtor ceased operations on Excelsior in July 1998, it had removed the entire accumulation of culm that had existed there in 1991. In fact, Swank testified that when the bank was exhausted, Debtor did some strip mining of the native coal that lay beneath the surface. Snyder's testimony and his Inspection Report dated October 23, 1997 confirm Swank's testimony, stating that "bank material processing appears to be near (sic) completed. A large stockpile is on site."(Debtor Ex. 14; 2 N.T. 129)[23] Gilberton's records show that 507,116 tons of culm were removed from Excelsior between 2006 and 2008, including culm located on land owned by Seedco. Gilberton did not assert that it or any of its affiliates had deposited the material on the site, only that Debtor forfeited its interest in the materials when it breached the Agreement in 1998. I have determined that Debtor did not forfeit its rights under the terms of the Agreement, thus any materials belonging to Debtor deposited on Gilberton's land remained Debtor's property. Further, Gilberton never had title to approximately 100,000 tons of culm that were deposited on Seedco's land. Thus, Gilberton has offered no basis on which to deny Debtor's claim to the proceeds of the sale of the culm.

As discussed above, Gilberton's records show that it was paid $5.10 per ton for 158,529.45 tons of culm and $7.00 per ton for the remainder, for gross revenues totaling $3,241,840.23. However, Debtor is not entitled to be compensated for the gross revenues from

---

[23]Flannery testified that he had visited the Excelsior cite "sometime in the late '90's" when Debtor sought to change its surface mining permit to allow strip mining. (2/12 N.T. 21). A DEP Inspection Report dated June 30, 2000 notes that on May 20, 1997, Debtor had filed a "Correction Application" with a "Revised . . . Operations Plan to include strip mining on 8.4 acres . . . ." The June 30 report further noted that "all strip mining has been completed, for at least this point in time." (Debtor Ex. 17).

26

the sale of the culm, but only for its market value, which is its sale price minus marketing costs. *Lehigh Valley Coal Co. v. Wilkesbarre & E.R. Co.*, 187 Pa. 145, 41 A. 37 (1898); *Brandemeir v. Stevens*, 99 Pa. Super. 86 (1930).

As discussed above, Gilberton claimed total expenses of $2,630,802.60. Debtor has disputed whether these expenses were reasonable because most of the services rendered and supplies provided were obtained from Gilberton affiliates. In particular, Debtor disputes the amounts paid to Barakat, which coordinated the independent truckers hauling the culm from the site. However, Gilberton's accountant testified credibly that these expenses were actually incurred and not mere accounting entries. Considering the amount of culm removed, the expenses for hauling, loading, equipment rental and repair, labor and fuel appear to be reasonable and may be deducted as marketing costs from the gross revenues received from the sale of the culm. However, included in the reported expenses was a royalty of $28,647.37 paid to SSI, a Gilberton affiliate and the nominal owner of the Excelsior Bank culm. Inasmuch as the culm removed belonged to Debtor and not to SSI, this expense will not be included as a cost of marketing to be deducted from the gross revenues when calculating Debtor's damages. Thus, Gilberton's allowable costs are $2,602,155.23. After subtracting Gilberton's expenses from the gross revenues received, Debtor is entitled to receive damages for conversion of its property in the sum of $639,685.00 ($3,241,840.23 - $2,602,155.23).[24]

---

[24]By determining that Debtor is entitled to damages in the amount of $639,685.00, I do not address whether Gilberton may have claims against Debtor for breach of the Agreement. In its Amended Disclosure Statement and Plan filed on October 19, 2007, Debtor states that it intends to assume the Agreement. Under the provisions of 11 U.S.C § 365(b), Debtor must cure or provide adequate assurance that it will cure any defaults in the lease. Because I have found that the Agreement did not terminate pre-petition, and Debtor admits that it did not make the minimum royalty payments of $1,000.00 per month since July 1998, it follows that Debtor will be required to cure this default in order to assume the Agreement. Gilberton may file a claim accordingly.

27

*(2) Wheelage*

"'Wheelage' is the price paid to a landowner for the privilege of hauling coal over the land. It is calculated on a price per ton figure, which is negotiated on the basis of such factors as the road's condition and the ease of hauling upon it." *Walley v. Iraca*, 360 Pa.Super. 436, 441, 520 A.2d 886, 889 (1987). Rights to the receipt of wheelage payments are generally created by contract, and they are intended to compensate the landowner for the intrusion on his property. *Robinson v. Stover*, 320 Pa. 308, 312, 182 A. 145, 146 (1936). At trial, Debtor attempted to establish its entitlement to wheelage damages through the testimony of David Domiano, whom it called to provide expert testimony regarding amounts typically charged for wheelage in coal industry contracts. However, Debtor was not successful in qualifying Domiano as an expert witness, thus leaving the Court with no evidence on which to base a calculation of damages. Moreover, even if Domiano had been qualified to establish a standard for wheelage damages, Debtor appeared to be asserting this claim as an alternative to damages for conversion. Therefore, having determined that Debtor is entitled to be compensated for the conversion of the culm, the issue of wheelage is moot.[25]

## H.  Gilberton's Counterclaim

In its post-trial brief, Gilberton admits both that it "did not end up out of pocket after extinguishing the fire, and to that extent cannot seek damages on its Counterclaim," and also that it "is unable to quantify the volume and value of material lost by being consumed by the fire, and so cannot perfect that otherwise valid claim." (Gilberton's Post Trial Brief, p. 29). Nonetheless,

---

[25]Additionally, as noted earlier, the Agreement specifically provides that if Debtor is unable to extinguish any fire on the site, Gilberton may fight the fire at Debtor's expense. (Debtor Ex. 1, p. 7). Under this provision, even if the Agreement had contained an express wheelage provision, any wheelage charges incurred by Gilberton in extinguishing the fire could reasonably be charged back to Debtor.

28

Gilberton seeks to recover the sum of $2,938.67 which it alleges to have been the value of Gilberton's culm that Kocur, acting as Debtor's agent, removed from Excelsior and sold.

Gilberton's counterclaim must be denied because, as I have found, the culm that existed on Excelsior Bank at the time of the fire belonged to Debtor, not to Gilberton.

### III. Conclusion

For the foregoing reasons, judgment will be entered in favor of Debtor and against Gilberton in the amount of $639,685.00 on Debtor's claim for conversion. Judgment will be entered in favor of Debtor and against Gilberton on Gilberton's counterclaim for damages. An appropriate order will be entered.

By the Court,

*Mary D. France*
Chief Bankruptcy Judge

Date: December 11, 2009

*This document is electronically signed and filed on the same date.*

29